UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

HEPTAGON CREATIONS, LTD.,

        Plaintiff,

-v-

CORE GROUP MARKETING LLC,
PLESKOW & RAEL CORPORATION,
and THOMAS RAEL,

        Defendants.

-------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 22 DEC 2011

No. 11 Civ. 01794 (LTS)(AJP)

### MEMORANDUM OPINION AND ORDER

        Plaintiff Heptagon Creations ("Plaintiff" or "Heptagon") asserts claims against defendants Core Group Marketing LLC ("Core Group" or "Core"), Pleskow & Rael Corporation ("Pleskow & Rael"), and Thomas Rael (collectively, "Defendants") for copyright infringement under 17 U.S.C. § 501, unfair competition and trade dress infringement under 15 U.S.C. § 1125(a) (Section 43(a) of the Lanham Act), and common law unfair competition. The Court has jurisdiction of this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. §§ 1338(a) and (b). Before the Court are Defendants' motions to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. The Court has considered thoroughly the parties' submissions and, for the following reasons, Defendants' motions are granted.

### I.    BACKGROUND

        The following facts are alleged in the First Amended Complaint ("Complaint")

and taken as true for purposes of this motion practice. Heptagon is a corporation that designs and markets high-end furniture and also provides interior design services to clients. (Compl. ¶ 5.) Defendant Core Group is a New York real-estate broker. (Compl. ¶ 6.) Defendant Pleskow & Rael is an architecture firm that also provides interior design services. (Compl. ¶ 7.) Defendant Thomas Rael is the managing partner and principal of Pleskow & Rael. (Compl. ¶ 8.)

Heptagon has designed and marketed the ANDRE JOYAU line of furniture since the year 2000. (Compl. ¶ 9.) The furniture line has been purchased and endorsed by several well-known individuals, including fashion designer Donna Karan, film director Sydney Pollack, and sculptor Joel Perlman. (Compl. ¶ 10.) Heptagon has used the ANDRE JOYAU furniture line to decorate the offices of corporate clients such as Playboy Magazine and ABCKO Music & Records, and various other public spaces, including the First Class Lounge for Korean Air at the Los Angeles International Airport (LAX), and the Columbia Hicks Condominium development. (Compl. ¶¶ 10, 12.) The ANDRE JOYAU furniture line has also been featured in several magazines, including the Hamptons Magazine Art Section, Elle Decor, Interior Design, and House & Garden. (Compl. ¶ 11.)

Core hired Pleskow & Rael to provide interior design solutions that would increase the appeal of Core's real estate listings. (Compl. ¶ 14.) In August 2010, Thomas Rael, in his capacity as an agent for Core, approached Heptagon and requested that Heptagon lend Core a collection of ANDRE JOYAU furniture "in exchange for the publicity and exposure it would give the brand and the work." (Compl. ¶ 13.) Core hoped to use the furniture to decorate condominiums which would then be featured on the Home and Garden Television ("HGTV") show "Selling New York," which follows Core and other real estate brokers as they attempt to sell high-end properties in the New York City area. (Compl. ¶ 13.)

Heptagon initially agreed to Core's request and provided Rael with photographs of the ANDRE JOYAU furniture so that Core could select the furniture pieces it wanted to feature on the show. (Compl. ¶ 15.) Ultimately, however, the furniture was not provided, as Core refused to purchase an insurance policy for Heptagon's pieces of furniture. (Compl. ¶ 16.)

On January 13, 2011, HGTV aired an episode of "Selling New York" titled "The Big Buy In."[1] (Compl. ¶ 18.) In that episode, Core sought to sell a condominium at 240 Park Avenue South (the "Park Avenue Property" or the "Property") with a list price of five million nine hundred and fifty thousand dollars ($5,950,000.00). Core's potential sales commission on the property was three hundred and fifty seven thousand dollars ($357,000.00). (Compl. ¶ 18.) In the episode, Core's real estate agent and CEO discuss the fact that the Park Avenue Property is less appealing to buyers because it is unfurnished. (Compl. ¶ 20.) Core's agents decide to solve this problem by creating virtual, fully furnished images of the Property's rooms and by screening images of ANDRE JOYAU furniture onto the walls of the Property. (Compl. ¶ 20; see also Compl. Exhs. 3 - 6.) Core then presented the virtually furnished Property to a group of potential buyers. (Compl. ¶ 20.) The end of the HGTV episode depicts Core selling the Park Avenue Property for five million eight hundred and ninety thousand dollars ($5,890,000.00), and earning a commission of three hundred fifty thousand four hundred dollars ($353,400.00). (Compl. ¶ 22.)

Heptagon alleges that Defendants' use of "virtual" ANDRE JOYAU furniture in their sales presentation constituted copyright infringement, trade dress infringement, and unfair competition. Specifically, Heptagon alleges that Defendants infringed its rights in nine distinct

---

[1] The complete episode may be accessed through HGTV's website, under the title "The Big Buy In," at http://www.hgtv.com/hgtv-selling-new-york/videos/index.html (last visited Dec. 20, 2011).

pieces of ANDRE JOYAU furniture: the Cocoon Chair, the Cross Table, the Form Table, the Meshu Floor Lamp, the Shimne Vase, the Sylvan Floor Lamp, the Yasu Floor Lamp, the Z Stool, and the Tate Chaise. (Compl. ¶¶ 24-34, 49.) Heptagon asserts that, as a consequence of Defendants' infringement, Defendants have been and will continue to be unjustly enriched, both from the sale of the Park Avenue Property and from the diversion of customers to themselves for sales and decorating services. Heptagon further asserts that it has suffered damages and losses to its profits, sales, and business. (Compl. ¶¶ 37 - 39; 56 - 57.)

II. DISCUSSION

A. Standard of Review

When deciding a motion to dismiss a complaint for failure to state a claim under Rule 12(b)(6), the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] reasonable inferences in favor of the non-moving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). While detailed factual allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Pleadings consisting only of "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotations and citations omitted).

pieces of ANDRE JOYAU furniture: the Cocoon Chair, the Cross Table, the Form Table, the Meshu Floor Lamp, the Shimne Vase, the Sylvan Floor Lamp, the Yasu Floor Lamp, the Z Stool, and the Tate Chaise. (Compl. ¶¶ 24-34, 49.) Heptagon asserts that, as a consequence of Defendants' infringement, Defendants have been and will continue to be unjustly enriched, both from the sale of the Park Avenue Property and from the diversion of customers to themselves for sales and decorating services. Heptagon further asserts that it has suffered damages and losses to its profits, sales, and business. (Compl. ¶¶ 37 - 39; 56 - 57.)

II. DISCUSSION

A. Standard of Review

When deciding a motion to dismiss a complaint for failure to state a claim under Rule 12(b)(6), the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] reasonable inferences in favor of the non-moving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). While detailed factual allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Pleadings consisting only of "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotations and citations omitted).

B.   Copyright Infringement Under 17 U.S.C. § 501

To state a claim for copyright infringement, a plaintiff must allege facts sufficient to demonstrate that 1) it owns a valid copyright; and 2) defendant has, without authorization, copied the copyrighted work. Kregos v. Associated Press, 3 F.3d 656, 661 (2d Cir. 1993); Aqua Creations v. Hilton Hotels, No. 10 Civ. 246, 2011 U.S. Dist. LEXIS 31982, at *8 (S.D.N.Y. Mar. 28, 2011). The Court finds that Heptagon has not adequately alleged that it owns a valid copyright.

Heptagon lacks a Certification of Registration of Copyright, as the Copyright Office rejected its registration application for the ANDRE JOYAU furniture collection "on the basis of functionality" because "the objects are utilitarian and contain no separable authorship." (Compl. ¶¶ 46 - 48.) This rejection, however, does not end the Court's inquiry. "Where the Copyright Office denies registration, and the unsuccessful applicant subsequently brings an infringement action, courts nonetheless make an independent determination as to copyrightability." Aqua Creations, 2011 U.S. Dist. LEXIS 31982, at *9 (S.D.N.Y. Mar. 28, 2011); see also Ward v. National Geographic, 208 F. Supp. 2d 429, 445 (S.D.N.Y. 2002). Therefore, this Court will examine the Complaint and determine whether Plaintiff's factual allegations, taken as true, are sufficient to support a finding of copyrightability for each of the nine pieces of ANDRE JOYAU furniture as to which Plaintiff asserts infringement claims.

The Copyright Act of 1976 protects "pictorial, graphic, and sculptural works," but explicitly limits the protection of utilitarian, or "useful," articles. The Act provides that:

> the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, and sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

17 U.S.C.A. § 101 (West Supp. 2011).[2] To adequately plead copyrightability in the absence of a certificate of registration, Plaintiff must allege facts sufficient to demonstrate that the design elements of its furniture are physically or conceptually separable from the furniture's utilitarian elements, and so entitled to copyright protection. Heptagon's Complaint alleges that the design elements of its furniture are "separable," but does not distinguish clearly between physical and conceptual separability. In its opposition papers, Heptagon indicates that its argument for copyright infringement is based on conceptual separability, but once again, the distinction between physical and conceptual separability is not clearly delineated. Given the imprecision of the Complaint and Plaintiff's arguments in this regard, the Court considers both physical and conceptual separability. As explained below, the Court finds that Heptagon has failed to adequately plead either.

1.  Physical separability

"[W]hen a component of a useful article can actually be removed from the original item and separately sold, without adversely impacting the article's functionality, that physically separable design element may be copyrighted." Chosun Int'l, Inc. v. Chrisha Creations, Ltd., 413 F.3d 324, 327 (2d Cir. 2005). For example, if a chair's back was adorned with a non-structural decorative design, that design would be a physically separable element that could be copyrighted, because the chair's functionality would be unaffected by the removal of the design. In contrast, if the entire chair was carved from a piece of wood, the pattern of the wood's grain would not be copyrightable, as it would be impossible to separate the design

---

[2] A "useful article" is defined as an article "having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." 17 U.S.C.A. § 101 (West Supp. 2011).

element of the grain from the chair without affecting the chair's functionality.

In <u>Aqua Creations v. Hilton Hotels</u>, plaintiff, a manufacturer of "sculptural lighting designs" sued defendant for copyright infringement, arguing that the creative elements of its light fixtures were both physically and conceptually separable from the fixtures' utilitarian features. 2011 U.S. Dist. LEXIS 31982, at *13. Plaintiff claimed that the artistically shaped shades of its light fixtures could be physically removed from the hardware (bulbs, wiring, etc.) of the fixtures, and were therefore copyrightable. <u>Id.</u> at *15-16. The court disagreed and granted defendant's motion to dismiss, finding that "although Aqua's light fixture may still 'illuminate a room' once its decorative shades are removed, a shade is an important functional element of a light fixture" and its removal would adversely affect a light fixture's functionality. <u>Id.</u> at *16.

In the Complaint, Heptagon discusses the nine works it contends are entitled to copyright protection, describing the alleged separability of the design elements from the utilitarian or functional aspects of each in turn:

<u>The Cocoon Chair</u>. (<u>See</u> Compl. ¶ 49a; Exh. 7.) Heptagon argues that the "arcuate sculptural form" that supports the armrests of the chair could be separated from the chair without affecting the chair's function of supporting a seated person. (Compl. ¶ 49a.) The illustration of the chair that is appended to the Complaint clearly shows, however, that the sculptural form actually comprises and supports the Cocoon Chair's arm rests and actually supports the seating area of the chair as well. The sculptural form could not be separated from the chair without adversely affecting its functionality as a chair with arm rests.

<u>The Cross Table</u>. (<u>See</u> Compl. ¶ 49b; Exh. 8.) Heptagon argues that the "depiction of a cross and four circles" on the top of this table is separable from the table, as "these

designs are capable of being drawn and existing independently of the table," and do not affect the functionality of the table. (Compl. ¶ 49b.) But, as Defendants note and the illustration appended to the Complaint confirms, the design on the top of the Cross Table is formed by pieces of wood that constitute structural elements of the Cross Table and thus cannot be deemed physically separable from the table simply because the design could be drawn on paper. Rather, because the design is a structural element of the wood from which the table is constructed, it could not be removed without robbing the table of its functionality.

The Form Table. (See Compl. ¶ 49c; Exh. 9.) Heptagon argues that the "crescent and circle" design on the top of the Form Table is separable from the table itself. As with the Cross Table, it is apparent from the exhibit appended to the Complaint that this "crescent and circle" design is part of the wood making up the table and so cannot be physically separated from the table without adversely affecting the table's functionality.

The Shimne Vase. (See Compl. ¶ 49d; Exh. 11.) Heptagon argues that the "angular orientation and color of the sides" of this vase are physically separable from the functional aspects of the vase. The appended exhibit shows, however, that the irregular sides of the vase actually comprise the vase, and could not be separated from the vase without adversely affecting its function as a container.

The Sylvan Floor Lamp. (See Compl. ¶ 49e; Exh. 12.) Heptagon argues that the "rectangle or silvery bar" that is part of this lamp is physically separable from the lamp's functional aspects, as it does not affect the lamp's ability to produce light. The appended exhibit shows, however, that the silvery bar supports the standing lights, and could not be separated from the lamp without adversely affecting its function as a free standing

upright lamp.

The Tate Chaise. (See Compl. ¶ 49f; Exh. 15.) Heptagon argues that the hollow supports and wood grain stripes on those supports are physically separable from the Chaise's function as a sofa. The appended exhibit shows, however, that the hollow supports hold up the Chaise and that the wood grain stripes are part of the material from which those supports are fabricated. The supports could not be separated from the Chaise without adversely affecting its function of providing a raised seating area.

The Yasu Floor Lamp. (See Compl. ¶ 49g; Exh. 13.) Heptagon argues that the Yasu Lamp's "function of providing illumination" is separate from its "wrinkled shade material." (Compl. ¶ 49g.) A shade is, however, "an important functional element of a light fixture," see Aqua, 2011 U.S. Dist. LEXIS 31982, at *16. Thus, even if the Yasu Lamp provided illumination without its shade, removal of the shade would adversely affect the lamp's functionality. See id.

The Z Stools. (See Compl. ¶ 49h; Exh. 14.) Heptagon argues that the board supports of the Z Stools are physically separable, as they are "a strictly decorative feature of the chair design." (Compl. ¶ 49h.) The appended exhibit shows, however, that the board supports actually hold up the Z Stools and could not be separated from the stools without adversely affecting the stools' seating function.

Nowhere in the Complaint does Heptagon allege that design elements of the Meshu Floor Lamp (see Compl. Exh. 10) are physically or conceptually separable from the lamp's utilitarian elements.

The Complaint is thus insufficient to state the protectability element of Plaintiff's copyright claim on the basis of physical separability.

2.  Conceptual separability

Conceptual separability is distinct from physical separability, and does not require that the artistic features of a product be capable of existing in physical separation from the utilitarian aspects. See Brandir Intern., Inc. v. Cascade Pacific Lumber Co., 834 F.2d 1142, 1144 (2d Cir. 1987). Rather, conceptual separability exists "where design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences." Brandir, 834 F.2d at 1145. Conversely, "if design elements reflect a merger of aesthetic and functional considerations, the artistic aspects of a work cannot be said to be conceptually separable from the utilitarian elements." Id. Courts have "decline[d] to find conceptual separability in articles whose shape - although designed to be aesthetically pleasing is dictated to a large extent by practical considerations." Aqua Creations, 2011 U.S. Dist. LEXIS 31982, at *17.

In Brandir, the Second Circuit applied the conceptual separability test in determining whether a bicycle rack whose shape was inspired by a sculpture could be copyrighted. The court held that the rack was not copyrightable because, although it "may have been derived in part from . . . [a] work[] of art," the final product inextricably intertwined form and function, with "its ultimate design being as much the result of utilitarian pressures as aesthetic choices." Brandir, 834 F.2d at 1147. Similarly, in Aqua Creations, the court held that plaintiff failed to plead conceptual separability because it alleged no facts "permitting the Court to find that the design [of its lighting fixtures] represent[ed] purely aesthetic choices, as opposed to 'a merger of aesthetic and functional considerations.'" 2011 U.S. Dist. LEXIS 31982, at *20 (quoting Brandir, 834 F.2d at 1145)). The Aqua Creations Court found that "it strains belief that

the creator of the [lighting] designs would have selected a shape for the lamp shades without giving any consideration to the need for illumination. The shape of lighting fixture shades is clearly informed by utilitarian concerns, and the associated creative elements are not conceptually separable." 2011 U.S. Dist. LEXIS 31982, at *20 - 21; see also Eliya, Inc. v. Kohl's Dept. Stores, No. 06 Civ 195 (GEL), 2006 U.S. Dist. LEXIS 66637, at *35-36 (S.D.N.Y. Sept. 13, 2006) ("for a design element to be conceptually separable, it must be the result of aesthetic decisionmaking that is independent of functional considerations . . . functional components of useful articles, no matter how artistically designed, have generally been denied copyright protection unless they are physically separable from the useful article").

Like the plaintiff in Aqua Creations, Heptagon has failed to allege sufficient facts to support a determination that the designs of the nine ANDRE JOYAU furniture pieces represent purely aesthetic choices. Just as the light fixture shades in Aqua were designed with an eye to utilitarian concerns, the ANDRE JOYAU furniture line was obviously designed with an eye to its practical use. "It strains belief" that the designer of a chair, stool, table or lamp would have selected the shape and materials for those pieces without considering their purposes of providing seating, support and illumination. The detailed descriptions of each piece of furniture set forth in the Complaint do not alter the fact that the aesthetic and functional aspects of the nine pieces of furniture are inextricably linked. Heptagon's assertions that the design features of its furniture "can be visualized separately, and are thus clearly separable," and that they can be "conceptualized as existing independently of their utilitarian function" (Compl. ¶ 50), are merely conclusory statements that do not satisfy the Iqbal/Twombly standard.

C.      Lanham Act Trade Dress Infringement

Section 43(a) of the Lanham Act authorizes a producer of a good to bring an

action against any person who uses "any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of [a good], or as to the origin, sponsorship, or approval of [that] good." 15 U.S.C.A § 1125(a) (West 2009); see also Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209 (2000). Section 43(a) is construed to protect not just word marks or symbol marks, but also trade dress. Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 114 (2d Cir. 2001). "A product's trade dress encompasses the overall design and appearance that make the product identifiable to consumers." Nora Beverages, Inc. v. Perrier Group of America, Inc., 269 F.3d 114, 119 (2d Cir. 2001). It is "essentially a product's total image and overall appearance . . . as defined by its overall composition and design, including size, shape, color, texture, and graphics." Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 31 (2d Cir. 1995) (internal quotations and citations omitted). Trade dress infringement claims generally involve either product packaging or product design. Courts are particularly cautious about trade dress claims in product design cases because "almost invariably, even the most unusual of product designs - such as a cocktail shaker shaped like a penguin - is intended not to identify the source of the product, but to render the product itself more useful or more appealing." Yurman Design, 262 F.3d at 114-15 (internal quotations omitted). Heptagon is not asserting a single trade dress claim for common elements of the overall ANDRE JOYAU line of furniture but, rather, claims that each of the nine pieces of furniture bears its own distinctive trade dress.

      A party asserting a claim of trade dress infringement in a product design case must meet four pleading requirements: (1) plaintiff must allege that there is a likelihood of confusion between the plaintiff's good and the defendant's; (2) plaintiff must allege that the

claimed trade dress is non-functional; (3) plaintiff must allege that the claimed trade dress has secondary meaning; and (4) plaintiff must offer a precise expression of the character and scope of the claimed trade dress. National Lighting Co. v. Bridge Metal Industries, 601 F. Supp. 2d 556, 560 (S.D.N.Y. 2009); see also Sherwood48 Assoc. v. Sony Corp. of Am., 76 Fed. Appx. 389, 391 (2d Cir. 2003). As explained below, Heptagon fails to allege sufficient facts to meet this standard.

1. <u>Heptagon has failed to allege that the claimed trade dresses are non-functional</u>

"A product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." Yurman Design, 262 F.3d at 116 (internal quotations omitted). Heptagon has failed to allege any facts demonstrating that its claimed trade dresses in the nine pieces of ANDRE JOYAU furniture are non-functional. Heptagon has alleged no facts demonstrating that any aspect of the nine individual pieces of furniture exists for the sole purpose of identifying ANDRE JOYAU and/or Heptagon as the source of the furniture. Rather, Heptagon's allegations in the Complaint make clear that the distinctive features of the nine furniture pieces serve aesthetic or functional purposes. For example, Heptagon alleges that the Cocoon Chair's "textured seating material and tree trunk cocoon siding represent non-functional artistic elements." (See Compl. ¶ 26; Exh. 9). The appended exhibit shows, however, that the seating material and tree trunk cocoon siding actually comprise the chair's seat and arm rests and so are features that are "essential to the use or purpose of the [furniture piece]" or "affect[] the cost or quality of the [furniture piece]." See Yurman Design, 262 F.3d at 116 (internal quotations omitted). The same holds true for the salient features of the other eight pieces of furniture.

2.  **Heptagon has failed to allege that the claimed trade dresses have secondary meaning**

A trade dress has secondary meaning "when a consumer immediately associates the dress of the product with its source." Sports Traveler, Inc. v. Advance Magazine Publishers, Inc., 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998). When determining whether a trade dress has secondary meaning, courts consider several factors, including: (1) plaintiff's advertising expenditures; (2) consumer surveys linking the trade dress to a particular source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the trade dress; and (6) the length and exclusivity of the use. Id. The Complaint contains allegations that the ANDRE JOYAU furniture line has been purchased by celebrities, featured in various magazines, and commissioned for use in the decoration of public and private spaces. (Compl. ¶¶ 9-12.) The Complaint does not, however, contain any allegations as to Heptagon's advertising expenditures, or consumer surveys linking the ANDRE JOYAU furniture line to a particular source. Additionally, all of Heptagon's allegations as to secondary meaning refer to the ANDRE JOYAU line as a whole; nowhere in the Complaint does Heptagon allege facts sufficient to establish that any of the nine *individual pieces* whose trade dresses are at issue have acquired secondary meaning in the mind of the public. In fact, Heptagon's exhibits in support of its allegations of secondary meaning include only one reference to any of the nine furniture pieces for which Heptagon seeks to establish secondary meaning. (See Compl. Exh. 2, p. 11 (featuring a picture of and reference to the Cocoon Chair).)

3.  **Heptagon has failed to plead a likelihood of confusion between its goods and those of the Defendants**

Heptagon fails to plead any relevant likelihood of confusion between its goods or

services and those of the Defendants.  See Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 382-83 (2d Cir. 1997).  Heptagon alleges that Defendants' use of Heptagon's furniture in presenting the Park Avenue Property was "intended to divert business from Heptagon as [Defendants' actions] are likely to cause confusion" between Core, Pleskow & Rael, and Heptagon.  (Compl. ¶¶ 35-36.)  However, Heptagon fails entirely to allege that Defendants compete in furniture design or marketing or that any member of the public would plausibly think that the allegedly infringed ANDRE JOYAU furniture pieces were designed or offered by Defendants.

The Complaint states that Heptagon is in the business of "designing and marketing high-end custom home furnishings and providing . . . interior design services, which are typically provided to clients in the course of providing furniture to them" (Compl. ¶ 5); that Core "is engaged in the business of rendering high-end real-estate brokerage, marketing and a variety of marketing related services" in New York. (Compl. ¶ 6); and that Pleskow & Rael is a corporation "engaged in the business of architectural and interior design services." (Compl. ¶¶ 7 - 8.)  The closest the Complaint comes to alleging that Heptagon and Defendants are competitors are the statements that both Heptagon and Pleskow & Rael provide "interior design services." The Complaint contains no more specific allegations as to the competition between Heptagon and Pleskow & Rael and contains no allegations whatsoever as to competition between Heptagon and Core.  It is thus devoid of any factual basis for an inference of a likelihood of confusion of Plaintiff's furniture (the products whose trade dresses were allegedly infringed) with any goods or services offered by Defendants, or vice versa.  As Heptagon asserts no claim of a trade dress in interior design services, any risk of confusion between Heptagon and Pleskow & Rael in that field is beside the point.

D.    Common Law Unfair Competition

In New York, a common law unfair competition claim is identical to a Lanham Act claim, save for the additional requirement that plaintiff show defendant's bad faith. See, e.g., Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980); Girl Scouts of U.S.A. v. Bantam Doubleday Dell Pub. Group, 808 F. Supp. 1112, 1131 (S.D.N.Y. 1990). Since Heptagon has not adequately alleged a Lanham Act claim, its claim for common law unfair competition necessarily fails.

## CONCLUSION

For the foregoing reasons, Defendants' motions are granted and Plaintiff's complaint is dismissed, pursuant to Fed. R. Civ. P. 12(b)(6). This resolves docket entry nos. 21 and 24. The Clerk of Court is requested to enter judgment dismissing the First Amended Complaint and close this case.

Dated: New York, New York
       December 22, 2011

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge